Filed 8/22/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>BORZOU BO BANIANI,<br><br>  Defendant and Appellant. | G048535<br><br>(Super. Ct. No. 10HF1852)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Reversed and remanded.

Law Office of Scott C. Thomas and Scott C. Thomas; Law Offices of Glew & Kim, Christopher Glew; for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant, a founding member of a medical marijuana cooperative, was charged with a sale of marijuana (Health & Saf. Code, §§ 11360, subd. (a); all further undesignated statutory references are to this code) and possession of marijuana for sale (§ 11359). The first jury was unable to reach a verdict, splitting six to six on the sales charge and nine to three for not guilty on the possession for sale charge. Defendant was permitted a defense under the Medical Marijuana Program Act (MMPA; § 11362.5 et seq.) in that trial. On retrial, he was denied the defense. The second jury was still unable to reach a verdict on the sales charge, but convicted defendant of possessing marijuana for sale. Because we find he was entitled to a defense under the MMPA and the error in precluding the defense was prejudicial, we reverse.

I

FACTS AND PROCEDURE

A. *Procedural Background*

Defendant was charged in an information with a sale of marijuana on March 23, 2010 (§ 11360, subd. (a); count one) and possession of marijuana for sale on April 7, 2010 (§ 11359; count two). His defense was that he had a physician's recommendation to use medical marijuana, he ran a medical marijuana cooperative in compliance with the MMPA, he was not present on the date of the sale, and the sale was made by a person who did not comply with the protocol of the cooperative. As noted above, the first jury hung six to six on the sales count and nine to three for not guilty on the possession for sale count.

In the second trial, the court held defendant was not entitled to a defense under the MMPA. The second jury was unable to reach a verdict on count one and found defendant guilty on count two, possession of marijuana for sale. The court placed defendant on three years of formal probation and imposed various fines, fees, and conditions. The court expressly authorized defendant's continued use of medical

2

marijuana due to his medical condition.  Count one was then dismissed on the People's motion.

B.  *Facts*

1.  *Prosecution Evidence*

In March 2010, Elijah Hayward worked as an undercover narcotics detective with the Newport Beach Police Department.  Using a fake name and driver's license, he visited a physician and obtained a recommendation to use medical marijuana.

On March 23, 2010, Hayward went to a two-story business building located on Campus Drive, based on information a marijuana dispensary was located there.  He went to an office on the second floor.  On the door was a sign that stated, "by appointment only."  Hayward knocked and saw someone peek through the blinds.  A male in his 20's, with dark hair and an olive complexion answered the door.  The male said his name was Sean, and invited Hayward in.[1]  Sean directed Hayward to a small waiting room and asked for his identification and physician's recommendation, which Hayward then gave him.  Sean left and entered another room.  After Hayward heard what sounded like a copying machine, Sean reappeared in the waiting room, returned the identification and recommendation to Hayward, and gave him a two-page membership application for Herbal Run Marijuana Collective (Herbal Run).  Hayward signed the application and gave it back to Sean.  Sean took the signed membership application back into the same room he had taken Hayward's identification and recommendation.

When Sean returned, he showed Hayward into another room.  This one contained a countertop and two refrigerators with clear, glass doors.  There were a number of jars of marijuana on display and a dry erase board on the wall.  Hayward said the board contained the names of different strains of marijuana and their prices.  Hayward

_____

[1] Defendant identified Sean as Shajad Khalaj, the treasurer of Herbal Run Marijuana Collective.

3

told Sean he wanted an eighth of an ounce of one of the strains. Sean weighed it out and Hayward paid him $60. Sean placed the container of marijuana in a bag and gave Hayward a marijuana cigarette and a small brownie, neither of which had Hayward requested.

On April 7, 2010, Officer Brian Mack of the Newport Beach Police Department was dispatched to the same location on Campus Drive based on reports of the smell of burnt marijuana at the location. Mack too smelled burnt marijuana. Mack knocked on the door and the smell of burnt marijuana got stronger when defendant answered the door. Mack explained why he was there and defendant said he had a marijuana recommendation permitting him to smoke marijuana.

Mack entered the office and asked defendant what business was run at the location. Defendant said he operates a property management and real estate investment company, Advantage. He added he also runs a marijuana dispensary in Costa Mesa and he uses the Advantage office as a storage facility.

Defendant unlocked doors to separate rooms, enabling the officers to search those rooms. During the search, officers found, inter alia, 78 pre-rolled marijuana cigarettes, seven lollipops labeled "candy containing marijuana," 24 chocolate bars containing marijuana, 12 plastic packets of salad dressing containing marijuana, a glass jar containing a pound of marijuana, a silver canister containing 16 grams of marijuana, and a plastic bag containing marijuana "shake." The officers also found a white dry erase board listing strains of marijuana and prices for the different strains. Additionally, the police found a three-ring binder containing a ledger of business transactions, and $310.

### 2. *Defense Evidence*

After the court held the defendant was not entitled to a defense under the MMPA, the defense introduced the following evidence. Defendant had a valid physician's recommendation to use medical marijuana, and a valid state medical

4

marijuana identification card and caregiver license, meaning he could be a caregiver to a patient with a recommendation for marijuana use.

Defendant started a medical marijuana collective, Herbal Run, because he had an uncle who passed away from pancreatic cancer. It was not defendant's intent to sell marijuana, as the collective is a nonprofit entity. Prior to creating the collective, defendant consulted with Attorney Stewart Richlin. Richlin, who also testified, drafted the collective's bylaws, reviewed state laws and the Attorney General's Guidelines with defendant, and filed the nonprofit articles of incorporation for Herbal Run. Additionally, defendant acquired a State of California Board of Equalization seller's permit.

His first indoor marijuana "grow" was with three other members of the collective in August 2009. Shortly afterward there were 10 members in the collective. Prior to becoming members the individuals were required to sign membership contracts drafted by Richlin.

Defendant invested money into the various "grows." He was not attempting to and did not make any profit off the "grows." The "grow" that resulted in the marijuana seized in April 2010, was the result of indoor and outdoor "grows." Those "grows" belonged to everyone in the collective, but Steven Sonders and an individual named John were the actual growers.

Defendant described the intake procedure whereby an individual may join the collective. Herbal Run's Web page did not have a street address on it. Neither did its business cards. To join the collective, individuals would call the telephone number on the Web site or business card. A member of Herbal Run would then take down the individual's information, including name, address, identification number, and the recommending physician's name and telephone number. The recommendation would then be confirmed with the recommending physician before an appointment was made for the individual to come into the office. At the appointment, an Herbal Run member would

5

review the bylaws with the individual and find out what the person could contribute to the process. Individuals who refused to contribute were not permitted to join.

In April 2010, Herbal Run had 70 to 75 patients. Defendant asked members to donate either time or money toward the "grow." When asked what activities the members contributed, defendant stated: "Everybody would put together, if they can help with the grow, if they had any experience with the grow, if they can just water the plants or trim or make butter or cook cookies." All the applicants were required to give time to the collective, but those who could not physically contribute to the cultivation of the plants donated money.

Defendant said the three-ring binder seized by the police is a log of the money donations made to Herbal Run. The log notes show whether the person making the donation was from a delivery or from "a walk-in," someone who called first and then made an appointment. The reason prospective members had to make an appointment was because a member needed to be present to process the application and members were not always there. Individuals were not permitted entry without having first made an appointment.

Defendant trained members who handled new patients. He specifically trained them to explain to an applicant the requirement of contributing time and effort. Defendant said he was not present on March 23, 2010, when Sean and Hayward engaged in a transaction. Defendant was visiting his grandmother in Iran. He added the two-page document Hayward said he signed was "not [a] complete document." Defendant said he did not find the two-page document Hayward said he signed. Defendant retained all his "patient" records. There was no record from March 23, 2010, and Sean never told defendant about the transaction. Sean should not have permitted an individual who had not gone through prescreening to enter.

Defendant explained the prices on the dry erase board were for patients who could not contribute their time because they were too sick and who would prefer to

6

pay. The amount was based on the expenses claimed by the growers. Defendant does not keep any money from monetary donations; that goes to the collective's growers to reimburse them for their costs. Defendant said he did not believe the growers were making a profit and he never attempted to make a profit.

Other members of Herbal Run testified about the requirements for obtaining medical marijuana from Herbal Run. Each testified to donating time or experience in exchange for medical marijuana.

## II

## DISCUSSION

Prior to the second trial, the prosecutor brought an Evidence Code section 402 motion to preclude defendant from asserting a defense under the MMPA. The defendant argued he did nothing illegal because he was a qualified patient whose physician recommended his use of medical marijuana, he formed a medical marijuana collective, Herbal Run, and operated the collective in compliance with the MMPA and the Attorney General's Guidelines. Specifically, he claimed his actions were protected under section 11362.775 of the MMPA and that section 11362.775 does not preclude the exchange of money for medical marijuana when the money is used to cover the costs of cultivation. The district attorney argued sales are not protected by the MMPA. He also asserted the MMPA did not apply because Herbal Run was a for profit organization. The court held defendant was not entitled to the benefit of the defense because there was evidence he charged for the marijuana. Consequently, defendant was precluded from presenting evidence on the defense and the jury was not instructed on it. Defendant claims the court prejudicially erred. We agree.

A. *Standard of Review*

"'It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains

substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . ." [Citations.]' [Citations.]" (*People v. Mentch* (2008) 45 Cal.4th 274, 288.) Specifically in cases raising the issue of whether a defendant is entitled to a defense under the Compassionate Use Act (CUA) or MMPA, the defenses "relate directly to the nature of the defendant's conduct as opposed to a collateral matters." (*People v. Jackson* (2012) 210 Cal.App.4th 525, 533.) Consequently, "those defenses only require that a defendant raise a reasonable doubt as to whether the elements of the defenses have been proven." (*Ibid.*) When the trial court addresses this issue, it does not consider the credibility of the witnesses. That issue is left to the jury to decide. (*Ibid.*; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.)


B. *Background: The CUA, MMPA, and the Attorney General's Guidelines*

In November 1996, the electorate enacted section 11362.5 as part of Proposition 215. The CUA was enacted "[t]o ensure seriously ill Californians have the right to obtain and use medical marijuana for medical purposes," when their use of medical marijuana has been recommended by a physician in the treatment for illness. (§ 11362.5, subd. (b)(1)(A).) The electorate enacted the CUA to ensure such patients and their primary caregivers[2] are not subject to criminal prosecution for obtaining and using marijuana for medical purposes. (§ 11362.5, subd. (b)(1)(B).) To that end, subdivision (d) of section 11362.5, provides that section 11357 [prohibiting possession of marijuana]

---

[2] The CUA defines a primary caregiver as "the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, and safety of that person." (§ 11362.5, subd. (e).)

and section 11358 [prohibiting cultivation of marijuana] do not apply to a primary caregiver or a qualified patient. "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).)

In addition to assuring qualified patients have access to medical marijuana, the CUA was intended "[t]o encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C).) On the whole, "the [CUA] is a narrowly drafted statute designed to allow a qualified patient and his or her primary caregiver to possess and cultivate marijuana for the patient's personal use despite the penal laws that outlaw these two acts for all others." (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 772-773.)

While the CUA expressly refers to sections 11357 and 11358 (§ 11362.5, subd. (d)), at least one court has found the CUA also provides, in appropriate cases, an implied defense to a charge of transporting marijuana (§ 11360, subd. (a)). *People v. Trippet* (1997) 56 Cal.App.4th 1532, involved an appeal from convictions for possession of more than 28.5 grams of marijuana (§ 11357, subd. (c)) and transportation of marijuana (§ 11360, subd. (a)) prior to Proposition 215's passage and enactment of the CUA (§ 11362.5). The defendant had attempted to use a medical necessity defense and presented the testimony of her physician. With the Attorney General's agreement, the appellate court found the CUA could be applied retroactively. (*People v. Trippet*, *supra*, 56 Cal.App.4th at pp. 1544-1545.) More pertinent to the issue presented in the present case, the court had to determine whether the CUA provided a possible defense to the charge of transporting marijuana.

9

The appellate court noted the CUA provided a defense to two specific sections pertaining to marijuana—section 11357 [possession of marijuana] and 11358 [cultivation of marijuana] (*People v. Trippet*, *supra*, 56 Cal.App.4th at pp. 1543-1544)—and the CUA was not intended to make wholesale changes to the criminal law relating to existing marijuana prohibitions (*id*. at p. 1546). That being said, the court noted a limited defense to a charge of transporting marijuana necessarily exists under the CUA, notwithstanding the fact that section 11362.5 does not list section 11360 as a statute that does not apply to qualified patients and caregivers. The Attorney General conceded as much. (*People v. Trippet*, *supra*, 56 Cal.App.4th at p. 1550.) "[T]he voters could not have intended that a dying cancer patient's 'primary caregiver' could be subject to criminal sanctions for carrying otherwise legally cultivated and possessed marijuana down a hallway to the patient's room." (*Ibid*.; see *People v. Emmal* (1998) 68 Cal.App.4th 1313, 1315 [transporation conviction upheld where drug was moved 20 feet]; see also *People v. Ormiston* (2003) 105 Cal.App.4th 676, 683 [transportation conviction upheld where defendant walked while in possession of drug].)

In 2003, the Legislature found qualified patients and their caregivers had been prevented from obtaining the protections intended by the CUA (Stats. 2003, ch. 875, § 1, subd. (a)(2)), and responded by enacting the MMPA (§ 11362.7 et. seq.) which became effective on January 1, 2004. The MMPA added "18 new code sections that address the general subject matter covered by the CUA." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1014.) Included therein were sections providing for the issuance of identification cards for qualified patients (§ 11362.71 — 11362.755), a section setting forth the amount a marijuana that may be possessed by qualified patients (§ 11362.77), a section listing places where the use of medical marijuana is prohibited (§ 11362.79), and a section urging Regents of the University of California to create the California Medical Marijuana Research Program (§ 11362.9). Relevant to the issue at hand, the MMPA also permits qualified patients and their designated primary caregivers to join together "in

order collectively or cooperatively to cultivate marijuana for medical purposes" without being subject to "state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (§ 11362.775.) The MMPA has expanded the scope of protection beyond that initially provided by the CUA, which was limited to cultivation of and possession of medical marijuana. (*People v. Urziceanu*, *supra*, 132 Cal.App.4th at p. 784.)

In 2010, the Legislature added section 11362.768 to the MMPA. (Stats. 2010, ch. 603, § 1.) This section implicitly recognizes the lawfulness of a "marijuana cooperative, collective, dispensary, operator, establishment or provider who possesses, cultivates, or distributes medical marijuana pursuant to" the MMPA, but prohibits such entities from operating "within a 600-foot radius of a school." (§ 11362.768, subd. (b).) "This section shall apply only to a medical marijuana cooperative, collective, dispensary, operator, establishment, or provider that is authorized by law to possess, cultivate, or distribute medical marijuana and that has a storefront or mobile retail outlet which ordinarily requires a local business license." (§ 11362.768, subd. (e).)

In 2008, before the enactment of section 11362.768 and pursuant to the requirement set forth in section 11362.81,[3] the Attorney General issued Guidelines concerning marijuana grown of medical use. (Cal. Atty. Gen., Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Aug. 2008) <http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf> [as of Aug. 15, 2014] (Guidelines).) The Guidelines noted the California State Board of Equalization (BOE) filed a notice that it would issue seller's permit to tax medical marijuana transactions. Possession of a seller's permit would not, however, permit *unlawful* sales of marijuana. (Guidelines, § I.D., pp. 2-3) The BOE Special Notice

---

[3] "[T]he Attorney General shall develop and adopt appropriate guidelines to ensure the security and nondiversion of marijuana grown for medical use by patients qualified under the Compassionate Use Act of 1996." (§ 11362.81, subd. (d).)

11

Information on Sales Tax and Registration for Medical Marijuana Sellers stated even those who do not make a profit from selling medical marijuana, must pay taxes on the sales. (BOE, Special Notice (June 2007), p. 2 <http://www.boe.ca.gov/news/pdf/173. pdf> [as of Aug. 15, 2014].) The guidelines note medical marijuana cooperatives and collectives are not authorized to make a profit from the sale or distribution of medical marijuana. (Guidelines, § IV.B.1, p. 9.)

The Guidelines also provide guidance to groups acting collectively or cooperatively in "cultivating and distributing marijuana for medical purposes." (Guidelines, § IV.A., p. 8.) Cooperatives must file articles of incorporation and cannot be organized to make a profit for themselves. (Guidelines, § IV.A.1, p. 8, citing Corp. Code, §§ 12201, 12300, 12311, subd. (b).) The guidelines further state cooperatives should not "sell" medical marijuana to "non-members." (Guidelines, § IV.A.2, p. 8.) However, the guidelines provide medical marijuana may be provided for free to qualified patients and caregivers; and may be provided in exchange for services rendered, "[a]llocated based on *fees that are reasonably calculated to cover overhead costs and operating expenses*," or a combination of services and fees. (Guidelines, § IV.B.6, p. 10, italics added.)

C. *Defendant was Entitled to a Defense Under the MMPA.*

The prosecution relied primarily on *People v. Mentch*, *supra*, 45 Cal.4th 274, and *People ex rel. Trutanich v. Joseph* (2012) 204 Cal.App.4th 1512 for the proposition that defendant was not entitled to a defense under the MMPA. In *People v. Mentch*, the defendant was charged with cultivating marijuana (§ 11358) and possessing marijuana for sale (§ 11359) among other charges not relevant here. He came to the attention of law enforcement as the result of large deposits of over $2,000 in small bills that reeked of marijuana. He deposited $10,750 in a two-month period. (*People v. Mentch*, *supra*, 45 Cal.4th at p. 278.) When his residence was searched, police found 187

marijuana plants in different stages of growth. Mentch admitted he sold marijuana, but claimed to have only sold to five medical marijuana users. (*Id*. at pp. 278-279.)

One medical marijuana user testified he gave Mentch $150 to $200 a month for medical marijuana. Another testified she had a physician's recommendation, she obtained marijuana from Mentch every month, and paid $200 to $250 cash for an ounce of marijuana. Mentch testified he opened Hemporium, a caregiving and consulting business to give people safe access to medical marijuana. (*People v. Mentch*, *supra*, 45 Cal.4th at pp. 279-280.) He said he provided medical marijuana to five qualified patients and he did not always charge them. He said the money he received was used to pay for the cost of cultivating and distributing the medical marijuana. (*Id*. at p. 280.) A narcotics investigator testified Mentch may have personally used some of the marijuana he grew, but opined defendant's operation was primarily run for profit. (*Id*. at p. 279.)

The issue in *People v. Mentch* was whether defendant was entitled to an instruction on the primary caregiver defense under the CUA. (*People v. Mentch*, *supra*, 45 Cal.4th at p. 288.) The charged offenses purportedly occurred prior to the effective date of the MMPA. (*Id*. at p. 278.) After finding Mentch did not qualify for the primary caregiver defense provided by the CUA in section 11362.5 because there was no evidence he had "'"*consistently* assumed responsibility for the housing, health, or safety of [the patient]"'" as required by section 11362.5 (*People v. Mentch*, *supra*, 45 Cal.4th at pp. 284-285)—an issue not presented here—the court concluded the defendant would not have been entitled to a defense under section 11362.765 of the MMPA either. (*People v. Mentch*, *supra*, 45 Cal.4th at pp. 291-292.)

*People v. Mentch* is of limited value to our analysis. First, it involved the application of section 11362.765, and whether Mentch qualified as a primary caregiver, issues not present here. The applicable statute in the present matter is section 11362.775. The conduct protected by section 11362.775 extends in appropriate cases to violations of section 11360. Subdivision (a) of that section not only refers to transportation, but also

13

the sale of marijuana. (§ 11360, subd. (a).) Second, *Mentch* was decided prior to the Legislature's enactment of section 11362.768 in 2010. That section prohibits medical marijuana cooperatives, collectives, dispensaries, or establishments from operating within 600 feet of a school (§ 11362.768, subd. (b)) and applies to organizations or individuals "authorized by law to . . . distribute medical marijuana and that [have] a storefront or mobile *retail* outlet which ordinarily requires a business license" (§ 11362.768, subd. (e), italics added). The Legislature therefore assumed a qualified patient or organization could, in certain circumstances, charge for medical marijuana. Thus, the existence of "retail" storefronts or outlets. Of course, the existence of such means of distributing medical marijuana to qualified patients or primary caregivers does not mean a dispensary, storefront, or mobile outlet may be run for profit or sell medical marijuana to those who have not received a physician's recommendation for use of medical marijuana. (See § 11362.765, subd. (a) [nothing in section authorizes the distribution of marijuana for profit].)

*People ex rel. Trutanich v. Joseph*, *supra*, 204 Cal.4th 1512, involved the application of a city attorney for an injunction. Joseph operated a storefront business known as Organica. A "confidential source" of the United States Drug Enforcment Agency (DEA) entered Orangica and purchased marijuana for $100. Over a week later, a DEA agent went into Orangica and paid $100 for marijuana. That same day, a search of the business turned up over 100 pounds of marijuana, over 260 pounds of edible products and beverages containing hashish oil, large amounts of hashish and hash oil, more than three pounds of psilocybin, and over $16,000 in cash. The DEA also recovered records demonstrating Organica had approximately 1,772 "patients." (*Id.* at p. 1516.) Opposing the injunction, Joseph argued Organica did not constitute a nuisance because his action was authorized by the CUA and the MMPA. (*Id.* at p. 1521.)

Like the decision in *People v. Mentch*, *supra*, 45 Cal.4th 274, the decision in *People ex rel. Trutanich v. Joseph*, *supra*, 204 Cal.App.4th 1512, has limited

14

application here. Without analysis, the court concluded "[n]either section 11362.775 nor section 11362.765 immunizes the marijuana sales activity conducted at Orangica. Section 11362.775 protects group activity 'to cultivate marijuana for medical purposes.' It does not cover dispensing or selling marijuana." (*People ex rel. Trutanich v. Joseph*, *supra*, 204 Cal.App.4th at p. 1523.) This statement does not appear to take into consideration two facts. First, section 11362.775 specifically applies to alleged violations of section 11360, the penal statute prohibiting the sale of marijuana. Second, as in *People v. Mentch*, *supra*, 45 Cal.4th 274, the appellate court in *People ex rel. Trutanich v. Joseph* did not consider the effect of section 11362.768, a Legislative enactment that inherently recognizes the lawfulness of the disbursement of medical marijuana from storefront or mobile retail outlets. (§ 11362.768, subd. (e).)

More pertinent to the present case are the decisions in *People v. Urziceanu*, *supra*, 132 Cal.App.4th 747, and *People v. Jackson*, *supra*, 210 Cal.App.4th 525. In *People v. Urziceanu*, the defendant was convicted of conspiring to sell marijuana prior to the enactment of the MMPA. The appellate court concluded the CUA did not provide a defense to the conspiracy charge, but found (1) the MMPA could be applied retroactively to the defendant's matter and (2) the MMPA provided a potential defense to the charge. (*People v. Urziceanu*, *supra*, 132 Cal.App.4th at pp. 758-759.)

The *Urziceanu* court noted the MMPA was the Legislature's initial response to the CUA's call to provide a plan "'for the safe *and affordable distribution* of marijuana to all patients in medical need of marijuana'" as set forth in section 11362.5, subdivision (b)(1)(C). (*People v. Urziceanu*, *supra*, 132 Cal.App.4th at p. 769, italics added.) Unlike the CUA, which limited its application to charges of possession of marijuana (§ 11357) and cultivation of marijuana (§ 11358), section 11362.775, enacted as part of the MMPA, specifically provided a defense to additional charges, including possession of marijuana *for purpose of sales* (§ 11359), among other charges. One of the other statutes specifically listed in section 11362.775 is section 11360. That section

15

generally prohibits the transportation *and sale* of marijuana. (§ 11360, subd. (a).) Notably, the effect of the MMPA generally, and section 11362.775 specifically, "represents a dramatic change in the prohibitions on the use, distribution, and cultivation of marijuana for" qualified patients and primary caregivers. (*People v. Urziceanu*, *supra*, 132 Cal.App.4th at p. 785.)

The court further found section 11362.775's "specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana." (*People v. Urziceanu*, *supra*, 132 Cal.App.4th at p. 785.) The court concluded the Legislature thereby "exempted those qualifying patients and primary caregivers who collectively or cooperatively cultivate marijuana for medical purposes from criminal sanctions for possession for sale, transportation or furnishing marijuana, maintaining a location for unlawfully selling, giving away, or using controlled substances, managing a location for the storage, distribution of any controlled substance for sale, and the laws declaring the use of property for these purposes a nuisance." (*Ibid.*)

That the Legislature intended such a result is further evidenced by its subsequent enactment of section 11362.768. As noted above, this section implicitly recognizes the lawfulness of a "marijuana cooperative, collective, dispensary, operator, establishment or provider who possesses, cultivates, or distributes medical marijuana pursuant to" the MMPA, and only prohibits such entities from operating "within a 600-foot radius of a school." (§ 11362.768, subd. (b).) If such activities by patients and primary caregivers were unlawful altogether, there would be no need to enact a statute prohibiting such entities only within 600 feet of a school.

Like defendant, the defendant in *People v. Jackson*, *supra*, 210 Cal.App.4th 525, was charged with sale of marijuana, possession of marijuana for sale, and the prosecutor sought to foreclose the defendant from asserting a defense under the MMPA.

16

Jackson testified at the hearing on the prosecutor's motion. He testified he and five other individuals cultivated medical marijuana for the 1,600 other members of the cooperative, and the cooperative did not generate profits for himself or the other growers. (*Id.* at p. 529.) Although the court found the collective was not operated for profit, it concluded that based on the large size of the organization, Jackson could not establish the organization was collectively cultivating medical marijuana within the meaning of the MMPA, and denied him a MMPA defense. (*Ibid.*)

The court found a defendant is entitled to a defense under the MMPA if he or she raises but a reasonable doubt as to whether the defense applies. The MMPA provides a defense when a defendant shows that members of the collective or cooperative: "(1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise." (*People v. Jackson*, *supra*, 210 Cal.App.4th at p. 529.)

Important to the facts presented in the present case, the court stated the MMPA does not require all the members of the collective or cooperative to actively participate in the cultivation process and their contribution to the organization "may be limited to financial support by way of marijuana purchases from the organization." (*People v. Jackson*, *supra*, 210 Cal.App.4th at pp. 529-530.) In the present case, there was evidence defendant had a physician's recommendation to use medical marijuana, he started Herbal Run and set it up as a not for profit corporation, he acquired a sellers license from the BOE, he did not make a profit on marijuana sold to qualified Herbal Run patients, and the money provided in exchange for marijuana was given to the growers to reimburse them for their costs. This evidence raised a reasonable doubt as to the application of the defense. Defendant was therefore entitled to a defense under the MMPA. Whether Herbal Run was operated for profit or not, would then be determined

17

by the jury. (*People v. Jackson*, *supra*, 210 Cal.App.4th at p. 533; *People v. Villanueva*, *supra*, 169 Ca.App.4th at p. 49.)

The prosecutor argued defendant was not entitled to the defense because the MMPA did not legalize the sale of medical marijuana. He asserted that while it may be lawful for a qualified patient unable to take part in the actual tending to the plants, or to devote time and effort on behalf of Herbal Run, to support the organization strictly through monetary contributions, the prosecutor argued any monetary contribution could not be contemporaneous with an exchange of marijuana. According to the prosecutor, such an individual would have to make his or her monetary contribution *prior* to the planting of the marijuana the patient would eventually be given.

The MMPA does not impose this limitation on qualified patients. First, the purpose of the MMPA is to ensure the promise of the CUA is fulfilled and qualified patients have safe access to affordable medical marijuana. We do not think the Legislature intended a seriously ill individual whose physician has recommended use of medical marijuana, and who is physically or otherwise unable to participate in the acts involved in cultivating medical marijuana, cannot simply pay money to his or her collective in exchange for the recommended medicine. It would be cruel for those whose need for medical marijuana is the most dire to require that they devote their limited strength and efforts to the actual cultivation of the marijuana, and then wait months for it to grow so they can use it, or to require that they make their monetary contribution and then wait months for the marijuana to be planted, grown, and harvested before they may lawfully be provided medical marijuana. Moreover, for some the cultivation and processing would not be completed until it was too late to provide any relief. The MMPA does not anticipate a patient who has received a physician's recommendation must thereafter wait months to lawfully acquire medical marijuana.

Of course, the MMPA did not make lawful all sales of marijuana. The defense it provides is limited to those qualified patients and primary caregivers who

18

associate together in a collective or cooperative. (§ 11362.775.) Additionally, sales for profit remain illegal. However, given the MMPA's purpose, one provision in the MMPA implicitly recognizes the legality of store front dispensaries, collectives or cooperatives (§ 11362.768), and another provision specifically provides a defense to violation of sections 11360 (sale or transportation of marijuana) and 11359 (possession of marijuana for sale), we conclude a member of a collective or cooperative may purchase medical marijuana from the collective or cooperative so long as the sale is not for profit. The district attorney's limited interpretation of section 11362.775 defeats the stated purpose of the MMPA to make access to medical marijuana easier for patients, and is contrary to a fair reading of the section. Section 11362.775 was written to provide a defense to a charge of selling marijuana in appropriate circumstances. Were this not the Legislature's intent, there would have been no need to list section 11360 or section 11366 [opening or maintaining a place for the purpose of selling or giving away marijuana] as statutes to which the defense applies.

The court's failure to permit the defense was prejudicial. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) When defendant was provided the defense in the first trial, the jury was unable to reach a verdict on the possession of marijuana for sale charge. When he was denied the defense in the second trial, the jury convicted him of possessing marijuana for sale. The Attorney General relies on *People v. Saddler* (1979) 24 Cal.3d 671, 684, for the proposition that if the court erred in failing to instruct the jury on the MMPA defense, the fact that the MMPA defense instruction was given in the first case and that jury was unable to reach a verdict does not establish prejudice. That reliance is misplaced.

*Saddler* involved an instruction to the effect that when a defendant testifies, the jury may draw adverse inferences from the defendant's failure to explain or deny evidence against him. (*People v. Saddler*, *supra*, 24 Cal.3d at p. 677.) While the instruction was not constitutionally improper, our Supreme Court found the evidence did

19

not support giving the instruction in that case.  (*Id*. at p. 675.)  Here, on the other hand, the error consisted of completely denying defendant not only a defense, but the defense he was relying upon.  If the jury accepted the defendant's version of the facts and it had been instructed regarding the MMPA defense, "it is reasonably probable that a result more favorable to" defendant would have occurred.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

## III

## DISPOSITION

The judgment is reversed and the matter is remanded.


                                        MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.

20