Filed 12/16/14  P. v. Raygosa CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B254318 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA405488) |
| v. | |
| EDWIN RIVAS RAYGOSA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Edwin Rivas Raygosa was charged with possession of marijuana with intent to sell (Health & Safety Code, § 11359)[1] and possession of concentrated cannabis (§ 11357, subd. (a)) after police recovered over four pounds of marijuana products from his vehicle during a traffic stop.  A jury convicted him on the charge of possession with intent to sell, and the court sentenced him to a suspended low term sentence of 16 months, with three years of formal probation with a condition that he perform 45 days of CALTRANS public service and register as a narcotics offender.  Defendant, who has a doctor's recommendation for medical marijuana, contends that the verdict should be overturned because the Medical Marijuana Program Act (§§ 11362.765 & 11362.775) provides him with immunity from prosecution on a charge of possession with intent to sell.  He also contends that the trial court erred in allowing a witness for the prosecution to testify as to the "legal circumstances under which someone can exchange marijuana at a dispensary."  We reject his first contention and conclude that although he is correct as to the second, the error did not prejudice him.  Accordingly, we affirm.

## FACTUAL & PROCEDURAL BACKGROUND

### *The People's Case-in-Chief*

On the evening of December 3, 2012, Los Angeles Police Department Officer Brian Smith stopped his patrol car near defendant's car at a traffic light.  Defendant was driving the car, and codefendant Arturo Hernandez was in the passenger's seat.  Smith, who testified that he has participated in approximately 100 contacts involving marijuana and attended a five-day "narcotics school," observed a puff of smoke emanate from the driver's side window and smelled an odor of marijuana.  Smith performed a traffic stop.

Smith informed defendant and Hernandez that he pulled them over because he smelled marijuana.  Defendant held up a green plastic canister containing a leafy green

---

[1]     All further statutory references are to the Health & Safety Code unless otherwise indicated.

2

substance and said, "This is all I have. I wasn't smoking it. The passenger was." Both defendant and Hernandez presented Smith with doctors' recommendations for personal marijuana use.

Smith ordered defendant and Hernandez out of the car and detained them while he searched the car for additional narcotics. Smith recovered "another small canister" from the front seat, a "large bag of marijuana as well as a glass jar of marijuana" from the backseat, and a backpack containing "three very large bags of marijuana" from the trunk. Each of the bags in the backpack was about the size of a football and weighed roughly one pound. The top of each bag was tied in a knot. The canisters bore labels like those typically used by "medical marijuana shop[s]." A forensic scientist who later tested the substances recovered from the car testified that they all contained marijuana or concentrated cannabis, also known as "hashish" or simply "hash." The scientist testified that the net weight of the recovered marijuana was approximately 2000 grams (4.4 pounds), and the net weight of the recovered hash was 1.97 grams (0.07 ounces).

Smith's search of the car also turned up a scale in the driver's side door and four cell phones: one charging in the cigarette lighter, one each in the driver's and passenger's side doors, and one in the trunk. Smith found a fifth cell phone on Hernandez's person. Hernandez also had approximately $1800 in cash, consisting of "various bills, 20s, 10s, fives, ones." Smith did not find any smoking paraphernalia, such as bongs, pipes, papers, or other "implements for ingestion of marijuana" in the car or on either occupant's person, nor did he recover any "spent joints" or other item that could have produced the smoke he observed. Smith testified that it would have been possible for a person smoking in the car to have thrown a joint out of the window prior to the traffic stop. Smith did not recover any weapons or small baggies.

Smith arrested defendant and Hernandez and took them to the police station for questioning. Smith questioned defendant first, after reading him his *Miranda*[2] rights.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

3

Defendant told Smith that he "gets marijuana in Santa Rosa" for his personal use. In response to Smith's query as to how defendant was able to keep such a large amount of marijuana fresh in knotted bags, defendant explained that he "uses large amounts in personal use."

Smith also Mirandized and questioned Hernandez. After initially disclaiming any knowledge of the marijuana in the car, Hernandez told Smith that it was for personal use. Hernandez also stated that the scale found in the car was "to measure their doses."

The People called Los Angeles Police Department Detective Anthony Jackson as their narcotics expert. Jackson was a 20-year veteran of the force who had 13 years of experience working various narcotics details. He also had received training about "how marijuana is cultivated, processed and packaged for street sales." For approximately four years, Jackson had been assigned to a unit tasked with investigating medical marijuana dispensaries. During that time, Jackson interviewed medical marijuana salespeople and customers, purchased marijuana at dispensaries, and even posed as a patient to obtain doctors' recommendations for medical marijuana. Jackson had one hour of formal training on medical marijuana and the Compassionate Use Act.

Jackson testified that in his experience, most dispensary customers purchase between a gram, which is about "one nugget or one bud of marijuana," and an ounce (28 grams), which "is quite a bit" and may be worth up to $300. A dispensary he visited while undercover once offered to sell him a full pound, however. Jackson further testified that the typical amount of marijuana in an individual dose taken by joint, blunt, or bong ranges from one-half gram to one gram. Doctors' recommendations for medical marijuana do not specify a dose or limit the amount that a person may use. (See *People v. Kelly* (2010) 47 Cal.4th 1008, 1018, fn.10; *People v. Windus* (2008) 165 Cal.App.4th 634, 642-643.)

When presented with a hypothetical based on the facts of this case, Jackson opined that "the persons that obtained the evidence that was recovered or seized in this case possessed those items for the purposes of sales." Jackson explained that this conclusion

4

was based on "the sheer amount" of marijuana recovered, the use of large bags of the type usually used by vendors transporting marijuana to dispensaries, the glass jar and canisters like those used in dispensaries, and the presence of the scale and large amount of cash. He opined that the scale was probably not for personal use, "because no one weighs out their marijuana, their cocaine and heroin and ingest [*sic*] it." Dispensaries sell their products by weight, however, and dealers "weigh it and prepackage it to sell on the street – but they will not carry a scale and weigh out narcotics in the street" because such street sales are "done by eyesight." As for the quantity of marijuana, Jackson opined that "[i]t is not reasonable" for one person to have that much for personal use; "[y]ou don't buy in bulk because it will break down on you." He further opined that the knotted plastic bags indicated that the owners "weren't concerned with the freshness of the marijuana" and were "transporting from one location to another location in disregard for how fresh it stayed."

Jackson also opined that the marijuana found in at least one of the canisters and the jar was not obtained from a dispensary. He explained that although the marijuana "appears to be high-grade marijuana" of the type that could be procured at a dispensary, he did not believe it actually was purchased at a dispensary because it still had sticks and stems attached to the buds and dispensaries typically cut those off when they sell to patients. Additionally, he opined, the large plastic bags of marijuana were "similar and identical to the type of bags that the vendors sell marijuana to the dispensaries in." Based upon that and the absence of smaller baggies or packaging material, Jackson concluded that defendant and Hernandez were selling marijuana to dispensaries in bulk. Jackson also testified that vendors who sell to dispensaries "always . . . come into the dispensary with a backpack [or] duffle bag" of marijuana, identify themselves as vendors, and "are allowed into the sale room" to "conduct their transaction with whoever the manager or owner was at the time." According to Jackson, vendors "always" package their product in knotted bags and are paid in cash. Jackson testified that no license is required to sell marijuana to a dispensary, and that vendors often come from northern California.

5

During direct examination, Jackson and the prosecutor also engaged in the following exchange, to which no objection was raised:

"Q: Based on your knowledge of dispensaries and the law in that area, how do the dispensaries legally obtain their marijuana?

"A: Dispensaries legally obtain their marijuana through the collective. That is how the system is supposed to work. The dispensary is to be a collective of patients and care givers. Whoever owns the dispensaries is supposed to cultivate it between the co-op or borrow it within themselves in the collective.

"Q: If you take a southern California collective or you take somebody from further upstate who is not part of their collective from a different part of the state, is it legal for them to sell marijuana through that collective?

"A: No. It is illegal to sell marijuana at all.

"Q: These collectives, can they profit from their enterprise?

"A: Collectives are not supposed to profit. They are able to make money to pay themselves to pay overhead, the rent of the building, for any administrative process. They are not supposed to make a profit.

"Q: To make a profit and not disclose that profit, would that be legal?

"A: That would be illegal."

Defendant's counsel also asked Jackson on cross-examination whether people are "allowed to exchange marijuana at a collective for a different type or strain of marijuana." Jackson answered yes. Jackson also answered "yes" to defendant's counsel's query as to whether "people are allowed to grow marijuana in California for personal use," and explained that "the Compassionate Use Act stated a person could cultivate 12 plants and six being mature."

### Defense Evidence

Defendant was born and raised in Santa Rosa, California. He graduated high school in 2007 and was employed as a journeyman carpenter at the time of trial. In 2009, defendant was "sucker punched" in the face during an altercation at Applebee's and

6

suffered damage to his right eye and tear duct. He had surgery to correct the damage, but the surgeon "reconstructed it really bad" such that defendant's eyelashes are now in the corner of his tear duct and his eye "cries constantly every time." Defendant experiences painful pressure in his eye. He also suffers from anxiety. Both of these conditions are alleviated by medical marijuana, for which defendant has a doctor's recommendation. Defendant obtained his first medical marijuana recommendation at age 18, prior to his eye injury. His current doctor's recommendation indicates that his complaints were "insomnia and loss of appetite." A custodian of records from a database corporation that collects and maintains records of people who have obtained medical marijuana recommendations testified that defendant's current recommendation is authentic.

At the time of the incident at issue in this case, defendant was on vacation in Los Angeles with his childhood friend Hernandez and his brother, Jason Rivas. All three young men had medical marijuana recommendations. The trio planned to stay in the Los Angeles area for a week or two and engage in "shopping, club hopping, adventure, trying to shop around." They brought three pounds of marijuana – the three large knotted bags – with them from Santa Rosa. Defendant explained that he grew the marijuana himself, and both he and Hernandez testified that it was "the whole year's crop." All of the marijuana except that in the glass jar belonged to defendant; the marijuana in the glass jar belonged to Hernandez.

Defendant opined that, in his experience, marijuana packaged in large plastic bags knotted at the top would stay fresh for about six months. That did not matter for the vacationers, however, as they planned to use most of the marijuana in the large bags during their trip. Defendant explained that in the two days preceding the traffic stop, the three men collectively had smoked about 11 ounces of marijuana. Defendant alone typically smoked between 10 and 20 four-to-five gram joints per day. He usually smoked about 20 grams at one sitting.

Defendant was interested in different strains of marijuana and liked to go "club hopping," or going to different dispensaries to obtain different strains of marijuana. All

7

of the marijuana he brought from Santa Rosa was of one type, sativa, that "you can smoke throughout the day and keep it moving" because it relaxes the body but heightens alertness. He wanted to obtain some of the indica variety on the trip (which, according to him, has the opposite effect), and purchased the recovered canisters at a dispensary about 20 minutes prior to being pulled over. Defendant intended to trade some of his marijuana during the trip as well, but did not have a chance to do so before the traffic stop that precipitated this case. Defendant testified on cross-examination that neither he nor Hernandez was running a collective or dispensary and that he was not associated with a collective.

Defendant explained that scales like the one recovered from his car were used to measure doses of marijuana, and that he had the scale for that purpose. When asked about the five cell phones, defendant testified that "two were [his], two were out of service, and two were [his] co-defendant[']s." He explained that he had two cell phones because one was a work phone and the other was a personal phone. Defendant testified that Hernandez was smoking a joint before Smith pulled them over but had stopped by the time of the traffic stop.

Hernandez, who was tried with defendant, also took the stand. He testified that at the time of the vacation to Los Angeles, he was working side jobs with his uncle "under the table" and was paid in cash. Hernandez did not have a bank account or credit cards because of collection efforts by creditors. He saved up cash from his jobs and brought approximately $2,000 in large bills with him to Los Angeles.

Hernandez testified that he, defendant, and defendant's brother had been in Los Angeles for two days when he and defendant were stopped and arrested. He recalled that he and defendant had stopped by "about two" marijuana dispensaries on the day of their arrests. Like defendant, Hernandez had a doctor's recommendation for medical marijuana and smoked five-gram joints approximately 18-20 times per day. He also had an identification card that he used to obtain medical marijuana. (§ 11362.71.) Hernandez presented the card to the arresting officers during the traffic stop. The officers "reviewed

8

it and said it was fake" and "threw it in front of the car." At the police station, Hernandez told officers that the marijuana in the glass jar was his and that all of the marijuana in the car was for personal use.

Hernandez agreed on cross-examination that he and defendant were partners in growing marijuana and had intended to trade some of their marijuana with dispensaries in Los Angeles. He also agreed that he and defendant were not a dispensary, were not partners with a dispensary, and did not provide their marijuana to anyone but themselves and defendant's brother.

Hernandez testified that he filled out a form when he visited the dispensary in Los Angeles. The form said that by signing he was joining the dispensary's collective. On recross-examination, Hernandez stated that he was not a member of a dispensary or collective but had "to sign up for a dispensary."

***The People's Rebuttal***

The People re-called Officer Jackson, out of order during Hernandez's testimony, as a rebuttal witness. The following exchange occurred during his brief direct examination:

"Q: What are the legal circumstances under which someone can exchange marijuana at a dispensary?

"[Counsel for Defendant]: Objection. Calls for a legal conclusion.

"The Court: Overruled.

"[A]: My understanding of the Compassionate Use Act Prop. 215 and Senate Bill 420, the Compassionate Use Act was generated, and that calls for persons with serious illnesses can obtain and use marijuana. They are able to possess eight ounces of dried marijuana, cultivate 12 plants, six of them being matured.

The Senate bill clarified some of the laws under Prop. 215, the Compassionate Use Act, indicating that patients and caregivers, as part of a collective, can grow, cultivate and exchange marijuana within their collective or co-op.

"Q: You have to be part of the collective; is that correct?

9

"A:    Yes.

"Q:    You have to be part of the cooperative; correct?

"A:    Yes.

"Q:    Part of the dispensary; correct?

"A:    Yes.

"Q:    Is that the means of legally exchanging marijuana?

"A:    Yes.  In any other case, it is a felony to sell, to even give away or trade marijuana.

"Q:    If you have a case such as this where you have somebody from a different part of the state with no affiliation with the collective exchanging marijuana with a collective, is that legal?

"A:    No.  It is not."

On cross-examination, defendant's counsel asked Jackson follow-up questions about the quantity limits, which Jackson conceded had been overturned by the California Supreme Court.  Defendant's counsel also asked whether dispensaries,  collectives, or individuals are allowed to distribute marijuana for a profit; Jackson testified that none of these entities is permitted to profit from marijuana distribution.

On redirect examination, Jackson testified that, "to legally exchange marijuana from one strain to another," an individual must be a member "of that collective."  On recross-examination by defendant's counsel, Jackson testified that a person can become a member of a collective by filling out certain paperwork.  "You enter the lobby. You do not become a member until you fill out their paperwork.  Once completing the paperwork, then they allow you into the sales room."  "It is up to the collective itself[,]" however, as to whether filling out the paperwork allows an individual to purchase or sell marijuana immediately.

DISCUSSION

*1.      Defendant was not immune from prosecution.*

Defendant states that the "primary question in the present case is whether appellant was immune from prosecution under the medical marijuana laws and whether the trial court erred in refusing to dismiss the prosecution after the defense presented evidence of trading within the collective."  He contends that he presented evidence that "clearly qualified" him for immunity from prosecution as provided in the Compassionate Use Act  of 1996 ("CUA") and the Medical Marijuana Program Act ("MMPA") and therefore the charges against him should have been dismissed.  We disagree.

In 1996, the California electorate approved Proposition 215 and thereby enacted the CUA. Intended to "ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana," the CUA provides that sections 11357 and 11358, which respectively prohibit the possession and cultivation of marijuana, "shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient."  (§ 11362.5, subds. (b)(1)(A) & (d); *People v. Mower* (2002) 28 Cal.4th 457, 463; *People v. Colvin* (2012) 203 Cal.App.4th  1029, 1035.)  Despite its seemingly broad language, the CUA "was not intended to decriminalize marijuana on a wholesale basis nor eviscerate this state's marijuana laws."  (*People v. Mitchell* (2014) 225 Cal.App.4th 1189, 1204; see also *People v. Mentch* (2008) 45 Cal.4th 274, 286, fn. 7.)  Put more colorfully, medical marijuana laws were not intended to be "a sort of 'open Sesame' regarding the possession, transportation and sale of marijuana in this state."  (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1546.) To the contrary, our Supreme Court has described the CUA as a "narrow measure with narrow ends."  (*People v. Mentch*, *supra*, 45 Cal.4th at p. 286, fn. 7.)  For instance, the CUA does not allow patients to possess unlimited quantities of marijuana; it permits only that "'the quantity possessed by the patient or the primary

11

caregiver, and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs.' (*People v. Trippet*[, *supra*,] 56 Cal.App.4th [at p. 1549].)" (*People v. Kelly*, *supra*, 47 Cal.4th at p. 1013, emphases omitted.)

The CUA likewise does not grant immunity from arrest or prosecution. (*People v. Mower*, supra, 28 Cal.4th at pp. 468-469, 475; *People v. Kelly*, *supra*, 47 Cal.4th at p. 1013.) Instead, it permits a defendant charged with possession and cultivation offenses to "defend on the ground that these provisions 'do not apply' (§ 11362.5(d)) because he or she is a qualified patient or primary caregiver." (*People v. Mower*, *supra*, 28 Cal.4th at p. 475.)**³** A defendant pursuing such a defense is required to raise a reasonable doubt as to the lawfulness or his or her conduct. (*Id.* at pp. 464, 481.) The trier of fact is tasked with determining whether the defendant has carried this burden. (See *People v. Trippet*, *supra,* 56 Cal.App.4th at 1549 ["What precisely are the "patient's current medical needs" must, of course, remain a factual question to be determined by the trier of fact."]; *People v. Frazier* (2005) 128 Cal.App.4th 807, 824; see also *People v. Dowl* (2013) 57 Cal.4th 1079, 1092 ["defendant offered explanations for some of these circumstances, but the jurors did not have to believe them"]; *People v. Baniani* (2014) 229 Cal.App.4th 45, 53.)

The MMPA, enacted by the Legislature in 2003 to "address issues not included in the [CUA], so as to promote the fair and orderly implementation of the [CUA] and to '[c]larify the scope of the application of the [CUA]'" (*People v. Mentch*, *supra*, 45 Cal.4th at p. 290), also has been characterized as "limited and specific." (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th

---

**³**    A defendant also may move "to set aside an indictment or information prior to trial on the ground of  the absence of reasonable or probable cause to believe that he or she is guilty." (*People v. Mower*, *supra*, 28 Cal.4th at p. 464.) Defendant orally moved to dismiss the charge of possession with intent to sell (§ 11359) on the ground that "there is no evidence of intent to sell beyond the officer's own assumption and guesswork" and to reduce the possession of concentrated cannabis charge (§ 11357, subd. (a)) from a felony to a misdemeanor in light of Defendant's "clean" record and the small amount of hash recovered. He did not invoke either the CUA or the MMPA. The trial court denied the motions.

729, 745 (*City of Riverside*).) As is pertinent here, the MMPA provides that certain individuals, including "a qualified patient or person with an identification card who transports or possesses marijuana for his or her own personal medical use," "shall not be subject, on that sole basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (§ 11362.765, subds. (a) & (b)(1).) It further provides that these same individuals "who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (§ 11362.775.) The phrase "'solely on the basis of that fact'" has been narrowly construed. (See *People v. Mitchell*, *supra*, 225 Cal.App.4th at pp. 1206-1207.)

Nothing in the MMPA "authorize[s] the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, nor shall anything in [the MMPA] authorize any individual or group to cultivate or distribute marijuana for profit." (§ 11362.765, subd. (a).) That is, to the extent that individuals stray beyond the immunized range of conduct, they remain subject "to the full force of the criminal law." (*People v. Mentch*, *supra*, 45 Cal.4th at p. 292; see also *id.* at p. 290 [the MMPA "does not provide globally that the specified groups of people may never be charged with cultivation or possession for sale"]. However, just as individuals charged with simple possession and cultivation may pursue an affirmative defense based on the CUA, individuals charged under the sections enumerated in the MMPA may defend based on the MMPA. (See *People v. Wright* (2006) 40 Cal.4th 81, 94, 96.) The defense is an affirmative one; a defendant is entitled to an instruction on the defense only after making an evidentiary showing that he is within the ambit of the MMPA. (*Id.* at p. 95-96; *People v. Solis* (2013) 217 Cal.App.4th 51, 57.)

Here, defendant presented evidence that he had a doctor's recommendation to use marijuana and that all of the marijuana recovered during the traffic stop was necessary for his personal medical needs. He also presented, in his attorney's words, "at least

13

circumstantial evidence" that he and Hernandez "joined a medical marijuana collective that very same day and were members of the marijuana collective." The trial court accordingly, "over the objection of the People," granted defendant's request to instruct the jury on the CUA and MMPA. The court, largely quoting MMPA section 11362.775, instructed the jury that "Qualified patients, persons with valid identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Sections 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570 of the California Health and Safety Code." The court also delivered the following three instructions:

(1) "Possession of marijuana with the intent to collectively or cooperatively cultivate marijuana for medical purposes is authorized under the Compassionate Use Act so long as the marijuana is not cultivated for profit."

(2) "Possession of marijuana is lawful if authorized by the Compassionate Use Act. The Compassionate Use Act allows a person to possess marijuana for personal medical purposes when a physician has recommended or approved such use. The amount of marijuana possessed must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess marijuana for medical purposes. If the People have not met this burden, you must find a defendant not guilty of this crime."

(3) "Possession of concentrated cannabis is lawful if authorized by the Compassionate Use Act. In order for the Compassionate Use Act to apply, a defendant must produce evidence tending to show that his possession or cultivation of concentrated cannabis was for personal medical purposes with a physician's recommendation or approval. The amount of concentrated cannabis possessed must be reasonably related to the patient's current medical needs. If you have a reasonable doubt about whether the defendant's possession or cultivation of concentrated cannabis was unlawful under the Compassionate Use Act, you must find the defendant not guilty."

14

Defendant does not dispute that all of these instructions accurately state the law. He contends instead that rather than so instructing the jury, the court simply should have dismissed the charges against him in light of his evidentiary presentation. This proposition is not supported by the law. The burgeoning body of case law interpreting the CUA and MMPA, including that from our Supreme Court, makes clear that these statutory schemes provide an affirmative defense, not absolute immunity from prosecution. The court properly instructed the jury on these statutes, allowing the trier of fact to determine whether defendant had raised a reasonable doubt as to the lawfulness of his conduct. Moreover, even if the MMPA did offer absolute immunity, nothing in the record suggests that defendant was arrested, prosecuted, or convicted "solely on the basis" of his purported association with others "in order collectively or cooperatively to cultivate marijuana for medical purposes." (§ 11362.775.)

The court also properly denied the motion for entry of judgment of acquittal (Pen. Code, § 1118.1) defendant made at the close of the People's evidence. Defendant's contention to the contrary is, as the People recognize, tantamount to an assertion that there was insufficient evidence to support his conviction. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 fn. 2.) "'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.]" (*People v. Brown* (2014) 59

15

Cal.4th 86, 105-106.) Testimony from a single witness is sufficient to support a conviction unless the testimony is physically impossible or inherently improbable. (*Id.* at p. 106.)

Here, the People presented substantial evidence from which the jury reasonably could have concluded that defendant intended to sell the large quantity of marijuana he possessed. Jackson testified that in his experience, people package marijuana like defendant did when they plan to sell it to a dispensary. He further testified that most people consume only one-half gram to one gram of marijuana per dose and that it would be unreasonable for one person to carry around so much marijuana for his personal use. Jackson opined that the knotted bags would not keep the marijuana fresh for very long, and that other evidence recovered during the arrest – the scales and cash – further indicated that defendant (and Hernandez) planned to sell the marijuana. A jury could conclude from this evidence that defendant possessed more cannabis than was reasonably necessary for his personal medical use and intended to sell it.

## 2. *Defendant was not prejudiced by the admission of legal testimony*.

Defendant also contends that the trial court erred – to his prejudice – by overruling his objection to Jackson's rebuttal testimony concerning the "legal circumstances under which someone can exchange marijuana at a dispensary." We agree that the court should not have admitted the contested testimony, but conclude that the error was harmless.

Evidence Code, section 801, subdivision (a) permits expert witnesses to "assist the trier of fact" by testifying to any subject "that is sufficiently beyond common experience." This broad provision "is limited in an important way." (*People v. Jones* (2013) 57 Cal.4th 899, 950.) "'[Although] opinion evidence which is otherwise admissible is not made inadmissible simply because it embraces the ultimate issue to be decided by the trier of fact . . . [t]he cited rule does not . . . authorize an "expert" to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence.' [Citations.]" (*Ibid.*) "'It is the court and not the witness which must declare what the law is, it not being within the province of a witness, for

16

example, to testify as to what constitutes larceny or burglary.' (*People v. Clay* (1964) 227 Cal.App.2d 87, 98.)" (*People v. Torres* (1995) 33 Cal.App.4th 37, 45-46.)

Here, Jackson testified in rebuttal as to his understanding of the "means of legally exchanging marijuana" under the CUA and MMPA. This was an impermissible legal conclusion that should not have been admitted into evidence.[4] We therefore must consider whether this error was prejudicial.

Defendant asserts, and we agree, that errors in the admission of evidence ordinarily are tested for prejudice under the standard announced in *People v. Watson* (1956) 46 Cal.2d 818, 836. (E.g., *People v. Coleman* (1989) 48 Cal.3d 112, 144.) Under this standard, an error is prejudicial only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson, supra*, 46 Cal.2d at p. 836.) We are not persuaded that standard has been satisfied here. The jury heard evidence that defendant and Hernandez had over four pounds of marijuana – his full-year's harvest, five cell phones, a scale, and a substantial amount of cash; that typical medical marijuana patients procure and ingest substantially less marijuana than defendant purportedly needed; and that defendant was not affiliated with any cooperative or collective. The court accurately instructed the jury on the law, including informing it that the court would "instruct you on the law that applies to this case" and that "you are not required to accept . . . as true or correct" the opinions of expert witnesses." The court also instructed the jury on defendant's requested MMPA and CUA defenses. In light of all of these circumstances, we cannot conclude that defendant was prejudiced under the *Watson* standard.

---

[4] The same is true of Jackson's direct examination testimony excerpted above, though Defendant did not object to that testimony and accordingly has forfeited any challenge to its admission. "It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal." (*People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4.)

17

Nor can we agree with defendant that the erroneous admission of the challenged evidence was so serious as to violate his federal constitutional rights to due process, rendering his trial fundamentally unfair. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) Defendant makes no argument regarding how the challenged testimony was "of such quality as necessarily prevents a fair trial" (*ibid*., quotation omitted), and we do not find this case to be "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id.* at p. 232.) Accordingly, we find no error under the more stringent federal due process standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24.

**DISPOSITION**

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

18