Filed 5/13/15  P. v. Lavalle CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KIM LAVALLE,<br><br>        Defendant and Appellant. | A139018<br><br>(Mendocino County Super. Ct.<br>No. SCUK-CRCR-12-21822) |

Defendant Kim Lavalle was convicted of one felony count of unlawfully transporting marijuana.[1]  On appeal, she contends that her conviction must be overturned because the trial court (1) admitted into evidence text messages obtained in violation of the Fourth Amendment; (2) denied her the opportunity to present a collective-cultivation defense under section 11362.775; and (3) incorrectly instructed the jury in four ways. We reject these claims and affirm.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

On January 11, 2012, Officer James Scott of the California Highway Patrol (CHP) pulled Lavalle over south of Ukiah after measuring the speed of the pickup truck she was driving as 78 miles per hour in a 55-mile-per-hour zone.  Lavalle was the driver of the truck and its only occupant.  As he was talking to Lavalle, Officer Scott smelled

---

[1] Lavalle was convicted under Health and Safety Code section 11360, subdivision (a). All further statutory references are to the Health and Safety Code unless otherwise noted.

1

marijuana in the passenger compartment, and he asked her if she was carrying any of that drug. She responded that "she had a little," at which point Officer Scott ordered her out of the truck. He then picked up "a garbage bag that was behind the driver's seat that looked full" and felt "individual packages inside about the size of a football," which he knew was a common way to package marijuana. He opened the garbage bag and saw individual bags that contained "green marijuana . . . [¶] . . . [¶] . . . in bud form." The bags were not labeled, and this indicated to Officer Scott that the marijuana inside was most likely for "commercial distribution" and not meant for medicinal use. He then seized the bags, which turned out to contain approximately eight pounds of marijuana.

Lavalle told Officer Scott that she was headed to San Francisco from Laytonville, where she had been "doing some general maintenance work and clean-up work for some friends." She said that the friends were named Juan and Burt, but she could not provide their last names or the address or phone number of their residence. As she was talking, she appeared "[v]isibly upset" and cried at times. She told Officer Scott that "[s]he was a painting contractor and business was extremely slow," "she had lost her home," and "[s]he was going to take the marijuana to San Francisco and try to sell it to a cannabis club." He then arrested her and transported her to a CHP office. Under further questioning, she stated that she intended to take the marijuana to a cannabis club called Emmalyn's in San Francisco and "put it on consignment," whereby she would "get a portion of the proceeds" if it sold. She made no statements to suggest that the marijuana was meant for any patient who could lawfully use it for medicinal purposes.

At the CHP office, another officer, Officer Robert Simas, seized from Lavalle a cell phone that contained various text messages that were eventually introduced into evidence. One message sent from Lavalle's phone two days before her arrest said, "I got the 10 ready. Will call u in the late morning 4 addrs." The next message sent from her phone said, "Ready to go out Wed. Ovr ni." Officer Simas testified that he had often seen similar messages when investigating narcotics cases. According to him, "the 10" referred to ten pounds of marijuana and the reference to calling for "addrs" meant that "if they've got the product, they're going to take that product and ship it off through U.S.

Postal Service, Fed Ex, UPS, whatever carrier they choose to use, and they'll give them the addresses of where these things need to go, they'll get shipped." Finally, the message saying "[r]eady to go out Wed. Ovr ni" meant that the marijuana would be shipped overnight on Wednesday. Officer Simas testified that when he showed these messages to Lavalle, "she just put her head down and sulked."

Officer Simas explained that another set of text messages on Lavalle's cell phone helped him determine that the exchange about "the 10" was related to marijuana. A message received by Lavalle's phone in late December 2011 from a contact named "Q phily GhostProwlers" read, "Got customers to deal w/. But only if its exactly the same smell quality & look. Yes grab it. No more OG its not the smelln like N.Y. sour. Ur not checking4smell." (Capitalization omitted.) A message sent from Lavalle's phone in response said, "Ok. Jerk is gone now. But I hear u on the og." According to Officer Simas, both "OG" and "N.Y. sour" referred to types of marijuana.

Only one defense witness testified at trial. Joseph Donato stated that he had AIDS, used medical marijuana, and designated Lavalle as his "primary caregiver" in December 2010. Originally, he took several pills a day "to counteract the side effects [of his AIDS medicine]," but then two of his physicians recommended he begin using medical marijuana. He calculated that he used approximately six ounces of marijuana a week by smoking it, mixing it in his food and alcohol, and adding it to a topical lotion. A document signed by one of Donato's physicians in November 2011 and introduced into evidence stated that Donato had been diagnosed with a qualifying condition and that "the use of medical marijuana is appropriate." A copy of Donato's medical marijuana identification card reflecting an expiration date in October 2011 was also introduced into evidence.

Donato testified that Lavalle owned and lived in the San Francisco building in which he resided. He met her through a mutual friend, she offered to let him and his partner live in the building rent free, and he moved into it in March 2011. Although Lavalle originally indicated they would need to leave the apartment once she found another tenant, Donato said "she never found another tenant [and] . . . [s]he likes us and

3

she takes care of me." In particular, Lavalle's duties as his caretaker included giving him rides to doctors' appointments and providing him with marijuana. Although he initially testified that she "cultivate[d]" and "gr[e]w" marijuana for him, he later stated that he did not know where she obtained the marijuana she gave him and had "no idea" whether she grew it herself. He could not provide any documentation of her status as his caregiver.

The jury found Lavalle guilty of unlawfully transporting marijuana, rejecting her primary-caregiver defense that the transportation was lawful because the marijuana was for Donato and she was his primary caregiver. The trial court suspended imposition of the sentence and placed her on probation for three years on the condition that she serve 45 days in county jail.

## II.
### DISCUSSION

A. *Lavalle's Cell Phone Data Was Admissible Under the Good-Faith Exception to the Exclusionary Rule.*

Lavalle claims the warrantless search of her cell phone data after she was arrested violated the Fourth and Fourteenth Amendments. Although she agrees that the search was lawful under *People v. Diaz* (2011) 51 Cal.4th 84 (*Diaz*) at the time of her arrest and trial, she argues that the intervening United States Supreme Court decision in *Riley v. California* (2014) __ U.S. __, 134 S.Ct. 2473 (*Riley*) requires reversal. We disagree. Under *Davis v. United States* (2011) __ U.S. __, 131 S.Ct. 2419, 2423-2424 (*Davis*), the exclusionary rule is inapplicable when, as here, a search is conducted in reasonable reliance on binding appellate precedent that is later overruled.[2]

Officer Simas testified that after Lavalle was taken to the CHP office, she asked to make a phone call and "pulled a cell phone out of her pocket." The officer "explained to her that she couldn't make a phone call at that moment and . . . seized the phone." He then examined the phone's text messages and discovered the messages that were ultimately admitted into evidence. Lavalle never filed a motion to suppress this evidence.

---

[2] A case involving the same issue is currently pending before our state Supreme Court. (*People v. Macabeo*, S221852.)

4

In *Diaz*, our state Supreme Court held that "a warrantless search of the text message folder of a cell phone" that occurred about 90 minutes after the defendant's arrest was valid under the Fourth Amendment as a search incident to arrest. (*Diaz*, *supra*, 51 Cal.4th at p. 88.) *Diaz* relied on a series of United States Supreme Court cases that included *United States v. Robinson* (1973) 414 U.S. 218, which broadly held that after a " 'lawful custodial arrest[,] a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment,' " "whether or not the police have reason to believe the arrestee has on his or her person either evidence or weapons" (the traditional justifications for the exception for searches incident to arrest). (*Diaz*, at p. 91, quoting *Robinson*, at p. 235; *Chimel v. California* (1969) 395 U.S. 752, 762-763.) *Diaz* reasoned that the determinative issue was "whether [the] defendant's cell phone was 'personal property . . . immediately associated with his person,' " answered in the affirmative, and held the search was therefore valid. (*Diaz*, at p. 93.)

In *Riley*, the United States Supreme Court declined to extend the rule in *United States v. Robinson, supra,* 414 U.S. 218 "to searches of data on cell phones, and h[e]ld instead that officers must generally secure a warrant before conducting such a search," effectively overruling *Diaz*, *supra*, 51 Cal.4th 84. (*Riley*, *supra*, 134 S.Ct. at p. 2485.) The high court explained that neither officer safety nor preservation of evidence justified the search of *data* on a phone no longer within a defendant's possession: while a cell phone itself might be used as a weapon, "data on the phone can endanger no one," and while a phone's data could be destroyed remotely by a third person, a search probably would not help to prevent that. (*Id.* at pp. 2485-2487.) Moreover, given the large amount of personal information stored on modern cell phones, the privacy concerns implicated by data searches were far greater than those at play when other physical objects on a defendant's person were searched. (*Id.* at pp. 2488-2489, 2494-2495.) The court concluded that any concerns about officer safety or the destruction of evidence were better addressed on a case-by-case basis by, for example, the exception for exigent

5

circumstances instead of by a blanket rule authorizing such searches without a warrant. (*Id.* at pp. 2486-2488, 2499.)

Lavalle first argues that she did not forfeit the issue of the exclusionary rule's applicability even though she failed to raise it below, and we agree. Although Fourth Amendment issues must generally be raised in the trial court (see *People v. Hart* (1999) 74 Cal.App.4th 479, 485), a failure to do so may be excused "where to require defense counsel to raise an objection 'would place an unreasonable burden . . . to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal.' " (*People v. De Santiago* (1969) 71 Cal.2d 18, 22-23.) Although *Diaz, supra*, 51 Cal.4th 84 is no longer good law after *Riley*, *supra*, 134 S.Ct. 2473, it was binding at the time of Lavalle's arrest and trial. Accordingly, Lavalle's failure to raise the issue below is excusable. (See *De Santiago*, at p. 23.)

The Attorney General effectively concedes that the search was unlawful under *Riley*, *supra*, 134 S.Ct. 2473, arguing instead that the text messages were properly admitted under *Davis*, *supra*, 131 S.Ct. 2419. *Davis* considered whether the exclusionary rule should be applied to evidence obtained lawfully under then-existing Eleventh Circuit precedent when the precedent was later undermined by a United States Supreme Court case. (*Id.* at pp. 2423, 2426.) Although the new rule announced in the later case applied retroactively, the United States Supreme Court concluded that suppression of the evidence was not automatically required because the issue whether the search was lawful was separate from the issue of remedy. (See *id.* at pp. 2430-2431.) Emphasizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," *Davis* relied on the good-faith exception to hold that " 'searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule' " when that "precedent . . . is later overruled." (*Id.* at pp. 2423-2424, 2426, 2429.)

We agree that even though the search here violated Lavalle's Fourth Amendment rights under *Riley*, *supra*, 134 S.Ct. 2473, the good-faith exception to the exclusionary rule applies because the search was lawful under *Diaz, supra*, 51 Cal.4th 84 at the time it

6

was conducted.  As mentioned above, Lavalle concedes the search was lawful under *Diaz*, and she does not offer any reason why it would have been unreasonable for Officer Simas to have relied on that decision when conducting the search.  (Cf. *Davis*, *supra*, 131 S.Ct. at p. 2435 (conc. opn. of Sotomayor, J.) [distinguishing situation where " 'binding appellate precedent specifically *authorize*[*d*] a particular police practice' " from "the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled"], italics in original.)  Instead, she claims that *Davis* applies only when "the United States Supreme Court [has] overruled its own Fourth Amendment precedents."  But this is clearly not the case:  it was Eleventh Circuit precedent, not United States Supreme Court precedent, that was undermined in *Davis* itself.  (*Id.* at p. 2426.)  Lavalle does not offer, and we cannot discern, any other reason why *Davis* does not control here.

Lavalle also argues that, even if the good-faith exception applies, we should " 'recognize a limited exception' " to it.  (Quoting *Davis*, *supra*, 131 S.Ct. at p. 2434.)  In *Davis*, the United States Supreme Court suggested that it "could, if necessary, recognize a limited exception to the good-faith exception for a defendant who obtains a judgment overruling one of [that court's own] Fourth Amendment precedents."  (*Ibid.*)  We fail to see how this statement supports making an exception for Lavalle, who is not seeking to overturn any precedent.  She also suggests that we could make an exception "based on the historical revulsion against unrestrained searches . . ., the historical recognition that the warrant requirement is an important part of our machinery of government, and the recent technological advances that have made the process of obtaining a warrant itself more efficient."  But these concerns apply to all unlawful searches, not just the one here, and in any event they do not free us to disregard *Davis*.  Finally, she claims *Davis*'s concern about " 'set[ting] the criminal loose in the community without punishment' " is inapplicable here because she has already served jail time and has been on probation since 2013.  (Quoting *Davis*, at p. 2427.)  But any time the applicability of the good-faith exception arises on appeal, the defendant will have already been punished to some extent. As we perceive no reason to make an exception by applying the exclusionary rule in this

7

case, we conclude the unlawfulness of the cell phone search does not require reversal of Lavalle's conviction.

   B.   *Lavalle Was Properly Precluded from Presenting a Collective-cultivation Defense Because She Failed to Produce Sufficient Evidence to Raise a Possibility the Defense Might Apply.*

Lavalle claims the trial court erred by not allowing her to present a defense under section 11362.775, which protects qualified individuals who associate to cultivate medical marijuana (collective-cultivation defense). She also claims the court erred by not permitting her to make an in camera offer of proof in support of her request to present such a defense. We disagree with both contentions.

   1.   Additional facts.

As a result of Lavalle's failure to timely disclose or subpoena documents, the trial court prohibited Lavalle from introducing any documentary evidence except the marijuana recommendation for Donato and one for another man, Bruce Rossignol.[3] This discovery ruling has not been challenged on appeal, but it is critical in understanding the context of the court's later ruling precluding Lavalle from presenting a collective-cultivation defense.

After the discovery ruling, the trial court held a hearing under Evidence Code section 402 (section 402) to determine whether Lavalle would be permitted to present a collective-cultivation defense. At the section 402 hearing, as at trial, Donato testified that he had AIDS, had a physician's approval to use medical marijuana, and had designated Lavalle as his "primary caregiver." He also testified that he was acquainted with Rossignol, whom he described as "the owner of [an] organization of helping medical marijuana . . . . He just has the co-op there, the space that he's trying to establish [as] a dispensary or whatever you want to call it for medical marijuana." On one occasion in early 2011, Lavalle brought Donato to this space, and he obtained marijuana there after establishing that he had a physician's recommendation for it.

---

[3] Donato's medical marijuana identification card was introduced at trial by the prosecution, not Lavalle.

8

The trial court continued the hearing until after the prosecution presented its evidence at trial. Before the hearing began again, Lavalle's trial counsel stated, "Your Honor, before Mr. Rossignol is brought in, perhaps I can suggest something that might expedite all of this." The court indicated it was "open to suggestion," and Lavalle's counsel stated, "Okay. I'm not indicating that [Lavalle] is going to testify in the case, but as far as . . . establishing the necessary elements of a [collective-cultivation] defense . . ., I could make an offer of proof to the court, but that would be done in camera." The prosecutor objected that he had not received advance notice of the intention to seek an in camera hearing, and the following discussing took place:

> [LAVALLE'S COUNSEL]: Your Honor, the defense is prepared to go with putting Mr. Rossignol on the stand. I was only trying to expedite—
>
> [PROSECUTOR]: It hasn't worked so far.
>
> THE COURT: I don't see anything having resulted in expedition. I'd like you to go ahead and call Mr. Rossignol.

Rossignol then took the stand. He testified that he had a physician's recommendation for medical marijuana at the time of Lavalle's arrest, and a document to this effect was marked for identification. He knew Lavalle through his work cultivating marijuana, which he began in 2010. Describing that work, he said, "We grow marijuana for our collective of patients who associate for the [purpose of] . . . providing our medicine to each other," and he then clarified that "we" referred to "[t]he collective of patients," which numbered about 40 people. Rossignol's girlfriend helped him run the collective.

According to Rossignol, Lavalle had "joined [the] collective via [an] intake process in the winter of 2011."[4] Her responsibilities included bringing plants to him, "watering the plants . . . and monitoring their nutrient intake," "going and meeting other growers and learning their methods," and, "when we don't have any medicine

---

[4] Rossignol initially stated that Lavalle was a member of the entity by virtue of "an intake form where she provide[d] her recommendation for medical cannabis," but the trial court ordered that response stricken based on the discovery ruling.

9

available[,] . . . sourcing other growers for medicine." Rossignol testified that he was aware Lavalle cared for Donato and that Donato was not a member of the collective. He also mentioned that Lavalle called him from jail after she was arrested. No evidence was presented, however, to suggest that the eight pounds of marijuana seized from her had anything to do with his entity.

On cross-examination, Rossignol agreed that Lavalle's trial counsel was the attorney for his "enterprise," was "aware of the documents that [the] enterprise gathers and keeps together," and was "the person who instructed [him] on [which] . . . documents . . . [he] should have to properly run [the] enterprise," including "documents to show nonprofit operation" and "membership applications and verifications." Rossignol testified that the records of the entity were stored at its office space in San Francisco. When questioned on re-direct, however, he clarified that Lavalle's counsel's representation of the entity had terminated before Lavalle's arrest and that counsel did not maintain copies of the entity's records.

After Rossignol finished testifying, the trial court addressed Lavalle's trial counsel as follows:

> I don't really think I need an offer of proof from your client either in camera or elsewhere. . . . [Use of an] in camera hearing to preserve Fifth Amendment rights could conceivably have some application to a case like this . . . .
>
> But, based on the testimony that I've heard from Mr. Donato and the testimony that I've heard from Mr. Rossignol—if you want to call [Rossignol's girlfriend], you can do that. If you want to argue it now, you can argue it now. I am mindful of the fact we have the jury waiting, but I do want to get this right.
>
> Do you want to argue it now or do you want to call another witness?

Lavalle's trial counsel responded that he wanted to argue the issue. He contended there was sufficient evidence that Lavalle was a member of the collective, that she was Donato's primary caregiver, and that the marijuana seized "was also in part for Mr. Donato's consumption as a lawful patient." The prosecutor focused on the absence

10

of business records, stating that even if there was a collective, it was "not a loosely organized enterprise" but "a structured enterprise . . . which [has] been hidden from the [trial] court and the prosecution." He concluded, "[I]t's very difficult to have that collective explained to this jury when there's just no evidence of its existence except people coming in saying 'believe me.' " Lavalle's counsel disputed this characterization of the entity and stated that "there has been testimony, at the very least, that there is a collective . . . [and] that Miss Lavalle is a member of that collective in her capacity as Joe Donato's primary caregiver."

The trial court ruled that Lavalle could not present a collective-cultivation defense. The court observed that "in the course of a number of proceedings relating to pretrial and pretrial discovery issues" Rossignol's organization "was described as a . . . 'loose configuration of people,' " and the court had expected membership of "four [or] five or so" people "without some sort of a cohesive real structure." It also noted that a key requirement was that a collective be nonprofit and that deciding whether that requirement was met "is essentially a matter of records and recordkeeping." The only documents before it, however, were the two physician's recommendations for Donato and Rossignol. It concluded, "One of the things that I think I do in [an Evidence Code section] 402 [hearing] is . . . test whether the type of evidence that's being proffered is [of] sufficient believability, quality, credibility and all that to be offered up. [¶] I spent [time] . . . attempting to come up [with] and review instructions so that we give the jury some guidance consistent with [*People v.*] *Jackson* [(2012) 210 Cal.App.4th 525 (*Jackson*)] about collectives and cooperatives. And the kind of points that I was looking at . . . [included] processes to determine whether somebody's a lawful patient, recordkeeping, updating, financial records, whether or not a business was registered as a nonprofit, [and] how they checked on their members to make sure that they . . . continued to have a valid recommendation."

Although the trial court had not decided whether the lack of records was determinative when it still thought there was a "loose organization of people" and not "a formal organization," having heard Rossignol's testimony, it could not see how the

11

defense could be presented "with essentially no records . . . [and] testimony from people who are, at best, unclear about critical elements of what's involved . . . . [¶] . . . [¶] . . . I don't see how you can call these folks to testify about their organization when they're going to start testifying about this record and that record, and this procedure and that procedure, and financial records and stuff, none of which [was] disclosed. And if Miss Lavalle is a member, which . . . for purpose[s] of this ruling, I'm accepting . . ., . . . then, she would know where to go for [those records]. And it is an ambush at trial. [¶] The Evidence Code does not really permit that."

   2.   The trial court did not err by refusing to permit Lavalle to present a collective-cultivation defense.

Lavalle claims that she met her burden of production at the section 402 hearing and was entitled to present a collective-cultivation defense. We disagree.

In 1996, voters passed Proposition 215 enacting the Compassionate Use Act of 1996 (CUA), which is intended to "ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician" and that such "patients and their primary caregivers . . . are not subject to criminal prosecution or sanction" for "obtain[ing] and us[ing] marijuana for medical purposes." (§ 11362.5, subd. (b)(1)(A)-(B); *People v. Colvin* (2012) 203 Cal.App.4th 1029, 1034-1035.)

Several years later, the Legislature enacted the Medical Marijuana Program (MMP), section 11362.7 et sequitur, which aimed, among other things, to "[c]larify the scope of the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals" by providing for a voluntary identification-card system and "[e]nhanc[ing] the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects." (Stats. 2003, Ch. 875, § 1; *People v. Kelly* (2010) 47 Cal.4th 1008, 1014; *Jackson*, *supra*, 210 Cal.App.4th at p. 534.) In particular, section 11362.775 of the MMP established the collective-cultivation defense by providing that "[q]ualified patients, persons with valid identification cards, and the

12

designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under" a variety of statutes, including section 11360, the one under which Lavalle was convicted. (§ 11362.775; *Jackson*, at p. 534.)

To establish a collective-cultivation defense under section 11362.775, a defendant must "show that members of [a] collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes [or designated primary caregivers of such patients], (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise." (*Jackson*, *supra*, 210 Cal.App.4th at p. 529.) Because the defense negates an element of the crime (in this case, that the transportation must be unlawful), a defendant has a "modest burden" to produce sufficient evidence of the elements of the collective-cultivation defense to create a reasonable doubt whether the crime was committed. (*Id.* at p. 533; see also *People v. Mower* (2002) 28 Cal.4th 457, 482-483.) "In determining whether that minimal burden has been met" and evidence of the defense should be permitted, " 'the trial court must leave issues of witness credibility to the jury.' " (*Jackson*, at p. 533.)

As we have discussed, the trial court held a section 402 hearing to decide whether Lavalle would be allowed to present this defense. Section 402 "provides a procedure for the . . . court to determine outside the presence of the jury whether there is sufficient evidence to sustain a finding of a preliminary fact, upon which the admission of other evidence depends." (*People v. Galambos* (2002) 104 Cal.App.4th 1147, 1156.) As *Galambos* explains, when a hearing under section 402 is used "to determine the existence of a defense," the relevant question is "whether all of the elements of [the] . . . defense can be made out before the evidence of that defense is either excluded or admitted" because "the relevance of the proffered defense[] depends upon the existence of facts sufficient to establish the defense['s] elements." (*Id.* at p. 1157.) Although "[t]here is some authority for the proposition that 'the correct standard of proof for a preliminary fact . . . is evidence sufficient to support a finding by a preponderance of the evidence,' "

13

that standard of proof does not apply here because "no greater burden can be imposed on the defendant at a pretrial section 402 hearing" than the burden the defendant has "to prevail at trial." (*People v. Jones* (2003) 112 Cal.App.4th 341, 350.) Thus, the relevant question is whether Lavalle "produce[d] sufficient evidence" of the elements of a collective-cultivation defense to create a reasonable doubt whether her transportation of marijuana was unlawful. (*Ibid.*; see also *People v. Baniani* (2014) 229 Cal.App.4th 45, 52, 59-60 [applying reasonable-doubt standard to determine whether trial court erred by not permitting CUA defense after hearing on prosecution's section 402 motion].)

We review de novo the trial court's refusal to permit Lavalle to present the collective-cultivation defense. (See *People v. Galambos*, *supra*, 104 Cal.App.4th at p. 1162.) In doing so, "we need not adopt the trial court's reasons [for its ruling] because ' " 'a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" [Citation.]' " (*Ibid.*)

Lavalle contends the trial court erred as a matter of law when it said one purpose of a section 402 hearing is "to test whether the type of evidence that's being proffered is [of] sufficient believability, quality, [and] credibility." We agree this statement was incorrect to the extent it suggested the court was making credibility determinations in deciding whether to permit a collective-cultivation defense. (*Jackson*, *supra*, 210 Cal.App.4th at p. 533.) This does not resolve the matter, however, because we must independently assess whether there was sufficient evidence produced to create a reasonable doubt whether the transportation was unlawful, and for purposes of our review we assume that Donato's and Rossignol's testimony was credible.

The trial court premised its ruling on Lavalle's failure to produce evidence that the collective was not operated for profit, and the parties focus their briefing on that

14

element.[5] Lavalle argues that sufficient evidence of the entity's nonprofit status was presented based on Rossignol's testimony about the entity's purpose of cultivating marijuana for patients.[6] She claims that the court "misconstrued *Jackson*[, *supra*, 210 Cal.App.4th 525] as a matter of law and erred [by ruling] that the absence of business records precluded the defense."

We agree with Lavalle that the failure to present records from an entity does not automatically preclude a collective-cultivation defense. In *People v. Orlosky* (2015) 233 Cal.App.4th 257, the same division of the Fourth District that decided *Jackson, supra,* 210 Cal.App.4th 525 considered whether there was sufficient evidence to permit such a defense where the defendant presented evidence that he and another man collaborated to cultivate marijuana together. (*Orlosky,* at pp. 262-263.) The trial court had "explained that some level of formality was required to warrant application of the defense, stating: '[W]hatever agreement [the other man] and [the] defendant had, I don't think that rises to the level of [a] collective' because a collective requires 'records, agreements, and not just two guys hanging out together saying, "[H]ey, maybe we should do this.' " (*Id.* at p. 270.) Although recognizing that "business formality has been identified as a *relevant evidentiary criterion* that increases in probative value as the size of the marijuana distribution enterprise increases," *Orlosky* rejected any reading of

---

[5] At our request, the parties submitted supplemental briefing on the significance of the lack of evidence presented at the section 402 hearing that the eight pounds of marijuana was cultivated or destined for Rossignol's entity. (See Gov. Code, § 68081.) The Attorney General argues that we should not rely on this circumstance to affirm the trial court's ruling because the tie between the marijuana and the entity was not a preliminary fact that needed to be proved before the defense could be presented, and we will assume, without deciding, that this is correct.

[6] Although Lavalle does not concede that she had "a burden to prove a non-profit enterprise," she does not give any reason we should disregard *Jackson*, *supra*, 210 Cal.App.4th 525 on this point. Although *People v. Colvin*, *supra*, 203 Cal.App.4th 1029, the case she cites in arguing that she met the required elements, does not mention a nonprofit requirement, we fail to see how anything in that decision is inconsistent with such a requirement, particularly given that the entity at issue in that case was, indeed, "a nonprofit corporation." (*Id.* at pp. 1037-1038.)

15

section 11362.775 to make such formality "a *mandatory* requirement that *automatically* excludes all informal collective cultivation arrangements from the purview of the collective cultivation defense." (*Orlosky,* at p. 271, italics in original.) Instead, it held that "the absence of formality does not foreclose establishment of the collective cultivation defense in a case involving a joint cultivation endeavor confined to two qualified patients with no outside distribution." (*Ibid.*) Under *Orlosky*, the absence of business records is not in and of itself fatal to a collective-cultivation defense.

The Attorney General counters that "the trial court's reliance on [the lack of] evidence of business and financial records to determine whether there was sufficient evidence for . . . [the] defense to go to the jury" was proper, citing *People v. Solis* (2013) 217 Cal.App.4th 51 and *People v. Colvin*, *supra*, 203 Cal.App.4th 1029. In *Solis*, the defendants argued that substantial evidence did not support their convictions "because the evidence compel[led] a finding" that the collective-cultivation defense applied. (*Solis*, at pp. 56-57.) The Court of Appeal determined that "substantial evidence support[ed] the trier of fact's finding that [the defendants]' evidence" failed to raise a possibility that the entity at issue "was a cooperative or collective as contemplated by the MMP," pointing to the facts, among others, that the entity "was not registered as a nonprofit" and "the financial records were not complete." (*Id.* at p. 59.) While *Solis* reinforces the relevance of business records in determining whether an entity operates on a nonprofit basis, the holding that a jury could reasonably rely on the absence of such records to reject a collective-cultivation defense does not amount to a holding that such records are *required* to establish the defense. Similarly, *Colvin* suggests that a trial court may properly rely on business records to find that an entity is a nonprofit, but it only discussed those records in the course of explaining the basis of the lower court's finding that the entity at issue was "a 'legitimate' dispensary." (*Colvin*, at pp. 1036, 1038.)

Ultimately, we need not decide whether to extend the holding of *People v. Orlosky*, *supra*, 233 Cal.App.4th 257 to bigger, more organized entities like the one Rossignol described. Unlike in *Orlosky*, business records were not presented here because of a discovery violation, not because they did not exist. The point of the trial

16

court's ruling was that Rossignol (and any other witness Lavalle might present) could not meaningfully testify about Rossignol's entity if any mention of the records was precluded. And this was true not only because the direct testimony would have holes in it but also because the prosecution would be unable to conduct an effective cross-examination. A defendant cannot, as Lavalle did here, fail to provide existing business records—which are highly relevant to whether a collective-cultivation defense may exist—and then expect to present the defense anyway. Accordingly, we conclude that Lavalle did not sustain her burden of production at the section 402 hearing.

   3.   Lavalle's claim involving her in camera offer of proof has no merit.

Lavalle also makes the related claim that the trial court violated her constitutional right to present a complete defense by refusing her request to make an in camera offer of proof at the section 402 hearing. We disagree.

Initially, we question whether Lavalle preserved this claim. Her trial counsel proposed an in camera offer of proof to "expedite" the section 402 hearing, but he apparently did so only as an alternative to presenting Rossignol's testimony and yielded after the prosecutor objected. Nor did Lavalle's counsel object when the trial court indicated its belief that, in light of Donato's and Rossignol's testimony, an in camera offer of proof was unnecessary. Lavalle's counsel never renewed his request to make an in camera offer of proof, much less gave any indication that Lavalle had evidence to offer that the other witnesses could not provide. As a result, it is far from clear that the court's remark that it did not need an in camera offer of proof amounted to a "ruling" preventing Lavalle from doing something she still wished to do.

But even assuming this claim was preserved, we reject it on its merits. Lavalle relies on cases approving the use of defendants' in camera offers of proof in various contexts to obviate the Fifth Amendment concerns that might otherwise arise. (*People v. Collins* (1986) 42 Cal.3d 378, 393-394 [defendant could make offer of proof in camera on remand to establish whether erroneous ruling was prejudicial]; *People v. Galambos*, *supra*, 104 Cal.App.4th at pp. 1156, 1159 [in camera offer of proof to establish whether

various defenses applied]; *People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1320-1321 [defendant could explain in in camera proceeding why requested discovery relevant to defense]; *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 945 & fn. 8 [where right to speedy trial at issue, offer of proof of exculpatory evidence witness would have given if available could be made in camera].) None of these cases establishes that a trial court is *required* to permit a defendant to make an in camera offer of proof. Yet Lavalle offers no reason the trial court erred other than that it denied her request. In particular, she never contends that she had any information to present that was different from what Donato and Rossignol had already testified to, much less that would have helped to establish her entitlement to a collective-cultivation defense. As a result, she has failed to convince us that the court erred or that any error was prejudicial.

### C. *Lavalle's Claims of Instructional Error Are Meritless.*

Finally, Lavalle claims the trial court erred by instructing the jury with a modified version of CALCRIM No. 2361. She takes issue with four ways in which the instruction given deviated from the standard instruction, each of which we discuss in turn and none of which entitles her to relief.

We review a claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) When an instruction is ambiguous, " ' "the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." ' " (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

#### 1. "May be lawful" versus "is lawful."

Lavalle first takes issue with the fact the jury was instructed that "[t]he transportation of marijuana *may be* lawful if . . . authorized by the [CUA]" (italics added) instead of that it "*is* lawful if authorized by the [CUA]." (CALCRIM No. 2361, italics

18

added.)  She argues that this constituted a "misinstruct[ion] on the sole[] disputed element" of the crime and therefore violated due process.

The Attorney General contends this claim was forfeited because Lavalle "failed to object to [the challenged] portion of the instruction at trial."  We agree.  Although Lavalle's proposed instruction used the word "is" instead of "may be," her trial counsel never objected to using the latter language.  In any event, we would reject the claim even if Lavalle had not forfeited it.  She does not offer any reason the modified language was erroneous or prejudicial except the conclusory statement that it amounted to a "misinstruct[ion] on the sole[] disputed element."  Of course, any deviation from a standard CALCRIM instruction is not automatically erroneous.  While it is true that the instruction given used permissive instead of mandatory language to describe the lawfulness of CUA-authorized marijuana transportation, the instruction also made clear that "the People ha[d] the burden of proving each element of the charge beyond a reasonable doubt, including that the transportation of the marijuana in this case was unlawful."  We fail to see how the jury could have concluded both that Lavalle's transportation of marijuana was authorized by the CUA—and thus, under her apparent reading of the instruction, at least potentially lawful—and that the transportation was unlawful beyond a reasonable doubt.  Read in context with the rest of the instruction, the use of "may be" instead of "is" was not erroneous.

> 2.  "Recommended or approved" versus "recommended and approved."

Lavalle's second claim of error relates to the instruction th0at "[t]he CUA allows a person to transport marijuana for personal medical purposes and/or as the primary caregiver of a patient with a medical need when a physician has recommended *and* approved such use" (italics added) instead of "when a physician has recommended *or* approved such use."  (CALCRIM No. 2361, italics added, brackets omitted.)  Lavalle argues that the language used "added another element to . . . the primary caregiver defense."

19

The Attorney General contends that Lavalle forfeited this claim by failing to object, and again we agree. Lavalle's trial counsel never objected to the use of "and" in the proposed instruction. And again, the claim would not entitle Lavalle to relief even if it had been preserved. The bench notes to CALCRIM No. 2361 explain that the optional "or approved" portion of the instruction should be given "[i]f the evidence shows that a physician may have 'approved' but not 'recommended' the marijuana use." The notes cite *People v. Jones*, *supra*, 112 Cal.App.4th 341, which held that a defendant was entitled to a defense under the CUA where he presented sufficient evidence that his physician had approved his marijuana use even if the physician had not recommended it. (*Id.* at pp. 346-347, 350-351.) *Jones* explained that the two terms had different meanings: "The word 'recommendation,' as used in the [CUA], suggests the physician has raised the issue of marijuana use and presented it to the patient as a treatment that would benefit the patient's health by providing relief from an illness. The word 'approval,' on the other hand, suggests the patient has raised the issue of marijuana use, and the physician has expressed a favorable opinion of marijuana use as a treatment for the patient. Thus, a physician could *approve* of a patient's suggested use of marijuana without ever *recommending* its use." (*Id.* at p. 347, italics in original.)

Even if the instruction was incorrect, any error was harmless. Donato specifically testified that two of his physicians "recommend[ed]" that he use medical marijuana, and a document introduced into evidence contained his physician's statement that "the use of medical marijuana is appropriate" for him. Thus, unlike in *People v. Jones*, *supra*, 112 Cal.App.4th 341, there was no dispute that the patient's marijuana use was both recommended and approved by a physician. As a result, we conclude that it is not reasonably probable that the jury would have reached a different result had it been instructed that a physician had to have "recommended *or* approved" Donato's use of medical marijuana and that any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

20

3. Instruction on Lavalle's burden of production.

Lavalle next challenges the portion of the instruction stating that she had "the burden of producing evidence to show an affirmative defense to the charge of unlawful transportation of marijuana [and t]his burden of proof requires sufficient evidence to create a reasonable doubt in an objective person that the conduct was unlawful," even though CALCRIM No. 2361 contains no such language. She identifies two problems with the added language. First, she argues that the reference to an "objective person" established a higher standard for acquittal than creation of "a reasonable doubt." Second, she claims that no instruction on her burden to produce evidence should have been given at all, relying on Justice Chin's concurring opinion in *People v. Mentch* (2008) 45 Cal.4th 274, which suggested that because "the defendant's burden [as to a compassionate-use defense] is only to produce evidence under Evidence Code 110[,] . . . once the trial court finds the defendant has presented sufficient evidence to warrant an instruction on the defense, the defendant has fully satisfied this burden; accordingly, the court should not instruct the jury on any defense burden." (*Id.* at p. 293 (conc. opn. of Chin, J.).)

The Attorney General argues that Lavalle forfeited this claim by failing to object, and we once again agree. Lavalle's trial counsel never voiced any concerns about this portion of the instruction. And, as with Lavalle's previous instructional arguments, we would reject the claim even if it had been preserved. Any confusion created by the instruction was cured by other instructions. The jury was instructed with CALCRIM No. 220, the general instruction on the People's burden to prove a defendant guilty beyond a reasonable doubt and the definition of that standard. And several other instructions reiterated the People's burden, including the challenged instruction itself. Indeed, the sentence immediately following the one challenged stated that the People had the burden to prove "each element of the charge beyond a reasonable doubt, including that the transportation of the marijuana in this case was unlawful." Thus, to the extent the portion of the instruction about Lavalle's burden might have confused the jury, the immediately following portion about the People's burden correctly established that the prosecution bore the ultimate burden of proving, beyond a reasonable doubt, that the

21

marijuana transportation was unlawful (and thus that the primary-caregiver defense did not apply). Reading the instructions as a whole, we conclude there is no reasonable likelihood that the jury misunderstood the challenged instructions to reduce the People's burden of proof or impose a burden on Lavalle that she did not have. (See *People v. Moore*, *supra*, 51 Cal.4th at p. 1140.) There was no error.

4. Instruction on need for physician to determine and recommend patient's current medical needs.

Finally, the jury was instructed that "[i]f the defendant presents evidence as an affirmative defense that he or she is a designated primary caregiver for a seriously ill patient, the quantity of marijuana transported and the method, timing, and distance of the transportation must be reasonably related to the patient's current medical needs *as determined and recommended by the patient's physician*," even though the italicized portion of the sentence does not appear in CALCRIM No. 2361. (Italics added.) Lavalle argues this phrase is erroneous because there is no requirement that a physician determine and recommend the amount of marijuana that is appropriate for the patient's needs. We conclude that any error was harmless.

The Attorney General contends that this claim was forfeited by Lavalle's failure to object. This time we are not so certain. Although Lavalle's trial counsel raised no objection to the added phrase during earlier discussions of jury instructions, he did so immediately before giving his closing argument, stating, "[T]he amount that a qualified patient may have, as described in the law, . . . is an amount that's reasonably related to the current[] medicinal needs of the patient. And I don't know of a particular case which ties it directly to the physician himself. I may be mistaken on that, but I believe that the instruction should read that it's an amount that is reasonably related to the current medicinal needs of the individual." The ensuing colloquy among Lavalle's counsel, the prosecutor, and the trial court suggests, however, that Lavalle's counsel eventually agreed the additional language was appropriate. Ultimately, we need not determine whether Lavalle forfeited this claim because any error in the instruction was harmless.

22

We begin by recognizing that the instruction may have been incorrect. The addition of the phrase "as determined and recommended by the patient's physician" may have been intended to incorporate section 11362.77, subdivision (b)'s allowance of possession of more than eight ounces of marijuana per qualified patient as long as the "qualified patient or primary caregiver has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs."[7] (§ 11362.77, subd. (b).) But our state Supreme Court has held that section 11362.77 is an unconstitutional amendment of an initiative statute to the extent it "burden[s] a defense that might otherwise be advanced by persons protected by the CUA" by imposing a specific quantity limitation and requiring a physician's recommendation to exceed that limitation. (*People v. Kelly*, *supra*, 47 Cal.4th at pp. 1017, 1024, 1049.) And there is authority for the proposition that the CUA provides an implied defense to transportation of marijuana under section 11360 even though the CUA only explicitly refers to the crimes of possession and cultivation. (§ 11362.5, subd. (d); *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1550-1551; see *People v. Wright* (2006) 40 Cal.4th 81, 90-92; but cf. *People v. Young* (2001) 92 Cal.App.4th 229, 236-237 [no implied defense to transportation under CUA].) While it is true, as the Attorney General points out, that after *Kelly* a physician's opinion remains a relevant *factor* in determining whether a compassionate-use defense exists (see *Littlefield v. County of Humboldt* (2013) 218 Cal.App.4th 243, 251-253), the instruction here *required* that the patient's medical needs be determined and recommended by a physician. As a result, the added language incorrectly incorporated section 11362.77, subdivision (b)'s requirements to the extent it burdened any defense Lavalle had under the CUA.

Nonetheless, any such error was harmless. Negligible evidence was presented that the eight pounds of marijuana was for Donato's use. The jury would have had to infer that the marijuana was for Donato's use based on the mere existence of a primary-

---

[7] At our request, the parties also submitted supplemental briefing on the issue whether the additional phrase was proper in light of section 11362.77. (See Gov. Code, § 68081.)

caregiver relationship between Donato and Lavalle. And it would have had to disregard the strong evidence to the contrary, particularly Lavalle's statement to Officer Scott that she intended to sell the marijuana, her failure to ever suggest she was transporting the marijuana as a primary caregiver, and the text messages suggesting she was dealing marijuana in quantities similar to the amount found in her truck. Moreover, there was no evidence to explain why, crediting Donato's testimony about his medical needs, she had what amounted to over five months' worth of a supply for him. As a result, we conclude it is not reasonably probable that the jury would have reached a different result if the challenged language had been omitted from the instruction and that any error was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## III.
### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.